Filed 5/10/13  P. v. Guzman CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B241144 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA051433) |
| v. | |
| JOSE M. GUZMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Blanchard, Judge.  Affirmed as modified.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Lawrence M. Daniels and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Jose Manuel Guzman was convicted, following a jury trial, of one count of robbery in violation of Penal Code section 211,[1] one account of assault with a firearm in violation of section 245, subdivision (a)(2), one count of aggravated mayhem in violation of section 205 and one count of torture in violation of section 206. The jury found true the allegations that appellant committed the crimes for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C), and the allegations that a principal personally and intentionally discharged a firearm in the commission of the robbery, mayhem and torture within the meaning of section 12022.53, subdivisions (b), (c), (d) and (e)(1). The trial court sentenced appellant to life with the possibility of parole for the torture conviction, plus 25 years to life in state prison for the firearm and gang allegations. The court stayed sentence on the other counts pursuant to section 654.

Appellant appeals from the judgment of conviction, contending that there is insufficient evidence to support the mayhem and torture convictions and the true finding on the gang enhancement. Respondent contends that the abstract of judgment should be corrected to reflect the trial court's oral pronouncement of sentence. We order the correction and affirm the judgment of conviction in all other respects.


Facts

Around December 20, 2010, Ruben Castro purchased $100 worth of marijuana from Shawn Jackson on credit.[2] Jackson was a member of the Temple Street 13 gang, and was known as "Fly." Jackson contacted Castro two days later and demanded that Castro pay him $300 for the marijuana. Castro did not pay.

On December 24, 2010, Castro called appellant, a close friend. Appellant was a member of the Junior Mafia 13 gang. Castro was not a member of any gang. Appellant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Jackson was tried separately for the same offenses as Castro. Jackson filed a separate appeal in case number B234802. His conviction was affirmed.

told Castro that his parents were out of town so they agreed to meet at appellant's house. Castro was expecting a small party.

When Castro arrived at appellant's house, appellant was just arriving as well and the house was dark. Appellant was with an individual Castro did not recognize. Castro was surprised that the house was dark and that no one else was home, as he was expecting a party. Inside the house, appellant told Castro to go into his mother's room and offered to go out and buy some alcohol. Castro gave appellant some money for alcohol, and appellant quickly left.

Five to ten minutes after appellant left, Castro saw Jackson standing by the doorway to the bedroom. Another individual Castro did not recognize stood behind Jackson. Jackson said, "What's up, mother fucker" and took out a gun and shot Castro above his left knee. Castro jumped up from the bed and tried to defend himself. Jackson hit Castro in the head three times with the barrel of the gun. On the third blow, the gun went off. Castro "blacked out" and "thought it was all over." While Castro lay on the floor, Jackson started to kick him wherever he could, including his face. Castro tried to protect his face from being kicked further. Castro was in "excruciating pain." Jackson tried to take Castro's pants off and when he was unable to do so, he reached into Castro's back pocket and took his wallet.

At some point, appellant entered the room and Castro heard Jackson talking to appellant. Jackson asked appellant if he wanted the money or if he wanted the "dope" for setting Castro up. Appellant responded that he wanted the drugs. Jackson handed appellant something and left the room. Appellant stayed in the room and a neighbor came in. Castro was able to call a friend, Juan Saenz, to pick him up. Appellant and his neighbor carried Castro out of the house, onto the porch and left him there. Saenz took Castro to his girlfriend's house and her uncle called an ambulance to take Castro to the hospital.

Before the ambulance arrived, Deputy Charles Dana from the Palmdale Sheriff's Office came to Saenz's house. Castro told Deputy Dana that he had been shot at

3

appellant's home by a person named Jackson. Deputy Dana spoke with Saenz, who identified the location of the shooting.

Deputy Dana then went to appellant's home. No one was there. Deputy Dana saw an open sliding glass door at the back of the residence. He also observed a bullet hole in a nearby window. Inside, Deputy Dana saw that the bullet hole was from the master bedroom window. Deputy Dana saw a bloody rag, a laundry basket with blood, and an unexpended .22 caliber bullet on the master bedroom floor.

Castro had surgery the next day to place a metal rod from his left hip to his knee. He had three screws implanted for a fractured femur and could not walk on his left leg for three months. He also sustained a six-inch gash to the back of his head, which required six staples as a result of being hit in the head. The pain in his left leg lasted nine months. Castro felt depressed, upset, and betrayed by appellant because he thought they were friends.

Detective Richard O'Neal, a gang detective for the Los Angeles County Sheriff's Department, was assigned to investigate the circumstances surrounding the shooting. He spoke with Castro a few days after the shooting. Castro told him that appellant and Jackson were involved in the shooting and positively identified them both in a six-pack photographic lineup. Castro identified Jackson as the shooter.

On December 30, 2010, Detective O'Neal executed the search warrant on Jackson's residence. There were surveillance cameras and barred screen doors at the exterior of the residence. Inside, in Jackson's room, Detective O'Neal saw gang-related items. There was a corkboard filled with gang graffiti such as "Jackson, T-S-T." A photograph of suspected gang members with "Temple Streeters" etched on it showed Jackson with tattoos indicating his membership in the gang. Detective O'Neal also saw a "pay-and-owe" sheet, narcotics paraphernalia, and syringes for narcotic use. The pay-and-owe sheet had Castro's name with "100" written next to it, identifying that Castro owed Jackson $100.

In January 2011, a search warrant was executed on appellant's residence. Appellant was not home. Appellant was not located until his arrest on November 20,

4

2011. A search of appellant's room revealed clothing associated with Hispanic gangs, and a notebook with gang graffiti, including "Varrio Junior Mafiosos" and appellant's gang name, "Flaco."

At trial, Detective O'Neal testified as an expert on gangs. He had been a gang detective for over four years and was familiar with the Temple Street gang, a Hispanic gang that started in West Los Angeles. Most Temple Street gang members were in the Los Angeles area, but there was a small group in the Antelope Valley area. Detective O'Neal was also familiar with the Junior Mafia 13 gang, a Hispanic gang which began in Bell Gardens. It is a small but violent gang. Most members are in the Bell Gardens area, but a small number are in the Antelope Valley area. Detective O'Neal explained that the gangs in the Antelope Valley tended to group together to give them strength in numbers. Members of different gangs committed crimes together which empowered them and allowed them to survive among other gangs in the area. Temple Street 13 gang members and Junior Mafia 13 gang members were known to often work together based on their affiliation with the Mexican Mafia.

Detective O'Neal knew appellant to be a member of the Junior Mafia 13 gang. A field identification card identified appellant as a member of Junior Mafia 13 in 2007, 2008, and 2010. Appellant had numerous tattoos showing allegiance to the gang.

Los Angeles Police Officer Jason Abner also testified as a gang expert. He was assigned to monitor the Temple Street gang, among others, and testified as an expert witness on Temple Street gang cases. Officer Abner testified that Temple Street considered areas of downtown Los Angeles, parts of the San Fernando Valley, South Central Los Angeles, and the Palmdale area as its territory. The primary activities of Temple Street included homicide, robberies, assault with a deadly weapon, weapons possession, narcotic sales, and vandalism. Narcotic sales were important to the gang as it produced revenue for the gang. The profit gained from narcotic sales were often used to purchase more drugs and weapons.

Temple Street also gave some of their profits from narcotic sales to the Mexican Mafia to serve as protection for gang members who were incarcerated. Officer Abner

5

explained that Temple Street 13 members were affiliated with the Mexican Mafia and as required, Temple Street paid taxes to the Mexican Mafia in exchange for protection inside the prisons. Generally, if a gang was under the Mexican Mafia, the gang was required to pay taxes to the Mexican Mafia, which was a percentage of the revenue from the sales of narcotics. Failure to pay taxes would result in a "green light," which was a term used to signal an assault on the gang or its gang members. The Junior Mafia 13 gang was also affiliated with the Mexican Mafia, and members of Temple Street 13 had been known to associate and work with Junior Mafia 13 members based on their affiliation.

Officer Abner opined that Jackson was a member of the Temple Street gang based on Jackson's numerous gang tattoos and self-admission to other law enforcement officers.

In response to a hypothetical that included the circumstances of the instant crime, Officer Abner opined that the shooting and subsequent assault was committed for the benefit of the gang. Officer Abner explained that the gang's existence was based on fear and intimidation. Once the fear was developed, gang members were free to commit crimes without fear of prosecution. However, as detailed in the hypothetical, if an individual ignored the gang member's repeated requests for payment for drugs, this fear would be lost if that gang member did not act on the uncollected drug sale. Not only was the gang member required to act on the uncollected drug sale, but it benefited the gang to keep the victim alive because the victim can serve as living proof that the gang was willing to commit violent acts against anyone who "crosses" them. Further, the money obtained from the drug sales promoted further criminal activity while a portion of the sales were used to pay taxes to the Mexican Mafia.

Discussion

1. Mayhem and torture

Appellant was convicted of aggravated mayhem and torture under a natural and probable consequences theory of accomplice liability. He contends that these crimes were not a natural and probable consequence of the target crime of assault with a firearm.

6

He further contends that there is no evidence that Jackson had the specific intent to maim required for aggravated mayhem or the specific intent to cause cruel and extreme pain required for torture. Appellant concludes that these convictions violate his state and federal constitutional rights to due process and require reversal.

A. Aggravated mayhem

A conviction for aggravated mayhem requires the specific intent to cause the maiming injury. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.) This specific intent "may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors." (*Ibid.*)

"Evidence which shows no more than an 'indiscriminate attack' is insufficient to prove the specific intent . . . ." (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835.) "'Furthermore, specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem . . . . [Citation.]'" (*People v. Park* (2003) 112 Cal.App.4th 61, 64.)

Appellant contends that in this case there was evidence of only an indiscriminate attack. We do not agree.

The evidence showed that Jackson came to appellant's house as part of a plan to collect an unpaid drug debt from Castro. Jackson used far more violence than was necessary to simply take money from Castro, however. In fact, Jackson shot Castro without making any demand for payment, or giving Castro the opportunity to pay his debt. Jackson had the element of surprise, and fired his gun when he was about seven feet from Castro. Thus, Jackson had the choice of where to hit Castro. He chose to shoot Castro in the thigh, shattering Castro's leg in three places. It is more than reasonable to infer that Jackson intended to disable Castro. Mayhem requires a permanent disability. Officer Abner testified that gangs often keep victims alive as proof that the gang is willing to commit violent acts against those who "cross" them. Thus, it is reasonable to infer that Jackson intended to inflict a permanent disability on Castro as a warning to others not to "cross" him or his gang.

B.  Torture

A conviction for torture requires a specific intent to cause cruel and extreme pain. (*People v. Burton* (2006) 143 Cal.App.4th 447, 452; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.)  This specific intent can be established by the circumstances of the offense.  (*People v. Burton*, *supra*, 143 Cal.App.4th at p. 452.)

Appellant contends that the evidence shows only that Jackson continued his assault on Castro after the shooting to render Castro completely helpless before he took Castro's wallet.  We do not agree.

After Jackson hit Castro on the head three times with the barrel of the gun, and after Castro collapsed to the ground and lapsed into semi-consciousness, Jackson continued his assault.  Castro was "all twisted up on the floor" at that point.  Jackson kicked Castro "wherever he could," including Castro's face.  Castro testified that he was in "excruciating pain" from the attack.  Jackson continued his attack well past the point that Castro was rendered completely helpless.  It is thus reasonable to infer that Jackson kicked Castro for the purpose of inflicting cruel and extreme pain.


C.  Natural and probable consequences

The target crime in this case was assault with a firearm.  Appellant does not dispute that there is substantial evidence that he intended to aid and abet Jackson's commission of that offense.

When a person aids and abets a confederate in the commission of a criminal act, the person is guilty not only of the crime that was originally contemplated and committed, but also of any other crime committed by the confederate that is a natural and probable consequence of the crime originally contemplated.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-262.)  Whether the other crime was a natural and probable consequence of the act originally encouraged is a question of fact for the jury.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376.)

"For a criminal act to be 'reasonably foreseeable' or a 'natural and probable' consequence of another criminal design, it is not necessary that the collateral act be

8

specifically planned or agreed upon, not even that it be substantially certain to result from the commission of the planned act." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 530-531.) The "question is not whether the aider and abettor *actually* foresaw the . . . crime, but whether, judged objectively, it was *reasonably* foreseeable." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133, original italics.)

Here, appellant knew that Castro had an unpaid drug debt to Jackson, and that Castro had been avoiding paying it. Appellant helped Jackson by tricking Castro into coming to an isolated location where Castro could not escape or seek help. It is reasonable to infer that appellant knew that Castro was likely to resist paying his debt and that Jackson intended to force him to pay. Jackson had a gun, but it was more than possible that simply pointing the gun would not produce the desired results. Further, appellant was a gang member, as was Jackson. Gangs rely on fear and intimidation to operate. Hurting but not killing someone who refuses to pay a debt to the gang benefits the gang, because the victim becomes living proof that the gang is willing to use physical violence against anyone who crosses them. Thus, it was reasonably foreseeable that extreme physical violence designed to send a message would ensue, and so reasonably foreseeable that aggravated mayhem and torture would occur.

### D. Constitutional claims

Since we have determined that "a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15, of the California Constitution [citation]." (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

### 2. Gang allegation

Appellant contends that there is insufficient evidence to prove that he committed the crimes for the benefit of the Temple Street gang with the specific intent to promote the gang's criminal conduct, and that such a conviction violates his state and federal

9

constitutional rights to due process. Appellant points out that he and Jackson belonged to different gangs and neither of them made gang signs, called out a gang name, wore gang colors, or in any other way referred to a gang. He also points out that the evidence shows that he was paid for assisting Jackson. He concludes that the evidence proves only that he helped Jackson for personal benefit, not for gang benefit.

Section 186.22 requires that the defendant commit the charged crime for the benefit of, at the direction of or in association with, the gang and that he do so with the specific intent to promote, further or assist any criminal conduct by the gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 51.)

The jury may rely on expert testimony about gang membership, culture, habits, and activities to reach a finding on a gang allegation. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944; *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620.) In turn, the gang experts may rely on conversations with gang members, their own personal investigations of gang-related crimes, and other information to render their opinions. (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 620.) "There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.'" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.)

Here, Officer Abner testified that Jackson was a member of the Temple Street gang and that narcotic sales were a primary activity of that gang. He explained that the narcotic sales produced revenue for the gang, which it used to purchase weapons and more narcotics, and also to pay the Mexican Mafia to serve as protection for gang members who were in jail. Officer Abner also explained that gang existence is based on fear and intimidation, and that a gang member would have to act on an uncollected drug debt to maintain the community's fear of the gang. In addition, Officer Abner opined that leaving a victim alive but badly injured would provide living proof that the gang was willing to commit violent acts against anyone who crossed them. This is more than

10

sufficient evidence to create a reasonable inference that Jackson committed the crimes for the benefit of a criminal street gang.

To the extent that appellant contends that expert testimony can never constitute sufficient evidence to support a gang enhancement, appellant is mistaken. "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048, quoting *People v. Albillar*, *supra*, 51 Cal.4th at p. 63.) Further, expert opinion in this area is often necessary to prove that a crime is gang-related because jurors may be unfamiliar with the culture and psychology of criminal street gangs. (See, e.g., *People v. Ward* (2005) 36 Cal.4th 186, 210 [expert may testify as to gang member's "likely reaction to language or actions he perceived as gang challenges"].)

There is also sufficient evidence to show that appellant committed the crime either for the benefit of or in association with a criminal street gang.

There was ample testimony that appellant was a member of the Junior Mafia 13 gang and Jackson a member of the Temple Street 13 gang. Both Officer Abner and Detective O'Neal testified that members of Temple Street 13 had been known to associate and work with Junior Mafia 13 members based on their affiliation with the Mexican Mafia. Detective O'Neal explained that this gave them strength in numbers that they would otherwise be lacking. The evidence showed that appellant assisted Jackson from the beginning to the end of the crimes. Not only did appellant help set Castro up for the confrontation, he helped complete the crime by carrying Castro out of the house. Thus, there was evidence that appellant committed the offenses in this case in association with a gang. (See *People v. Albillar*, *supra*, 51 Cal.4th at pp. 60-62; see also *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, fn. 7 [fact that defendant had fellow gang member in stolen vehicle with him supported finding that he acted in association with the gang]; *People v. Leon* (2008) 161 Cal.App.4th 149, 163 [because defendant committed offenses in association with fellow gang member, he committed them "in association with any criminal street gang"].)

11

The evidence was also sufficient to establish that appellant acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members." As the California Supreme Court has explained, "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 68; see also *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 ["Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime."].) That was the case here, and the jury could reasonably infer that appellant intended to assist in criminal conduct by a fellow gang member.

Since we have determined that "a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15, of the California Constitution [citation]." (*People v. Osband, supra,* 13 Cal.4th at p. 690.)

### 3. Sentence correction

Respondent contends that the abstract of judgment does not clearly reflect the trial court's oral pronouncement of sentence on the count 6 enhancements and must be corrected. Appellant does not dispute this claim. We agree that the abstract should be clarified.

The trial court correctly imposed life with the possibility of parole for the count 6 torture conviction, plus one consecutive term of 25 years to life in prison for the firearm and gang enhancements. (*People v. Brookfield* (2009) 47 Cal.4th 583, 590.) The abstract shows "25Y" for the firearm enhancement and "25Y" for the gang enhancement. The "25Y" notation for the gang enhancement is ordered stricken and the "25Y" notation for the firearm enhancement is clarified to read "25Y to life."

12

Disposition

The "25Y" notation in the abstract of judgment for the gang enhancement is ordered stricken and the "25Y" notation for the firearm enhancement is ordered clarified to read "25Y to life."  The clerk of the superior court is instructed to prepare an amended abstract of judgment reflecting this correction and to deliver a copy to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ARMSTRONG, Acting P. J.

We concur:

KRIEGLER, J.

O'NEILL, J.[*]

---

[*] Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.