Filed 12/12/22  P. v. Lezama CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GEOVANNI LEZAMA,<br><br>    Defendant and Appellant. | 2d Crim. Nos. B308578,<br>B310949<br>(Super. Ct. No. BA463515)<br>(Los Angeles County) |

Geovanni Lezama appeals from the judgment after the jury convicted him of aiding and abetting both first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a), count 1) and simple mayhem (§ 203, count 6).  On both counts, the jury found true the allegations that Lezama committed these crimes to benefit a criminal street gang pursuant to section 186.22, subdivision (b)(1)(C) and that a principal in the crimes, Lezama's accomplice, personally and intentionally used a firearm, causing death within

---

[1] Further unspecified statutory references are to the Penal Code.

the meaning of section 12022.53, subdivisions (d) and (e)(1). The trial court sentenced Lezama to a total of 50 years to life for aiding and abetting a murder committed to benefit a criminal street gang (25 years to life for first degree murder plus 25 years to life for the section 12022.53, subdivision (e)(1) firearm allegation), a consecutive two years for unlawfully possessing ammunition, and a consecutive eight months for evading a police officer after Lezama admitted violating probation. The court stayed the punishment for the simple mayhem conviction pursuant to section 654.

Lezama contends (1) there was insufficient evidence to support his simple mayhem conviction after jury trial, (2) Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5) (Assembly Bill 333) requires that we vacate the section 186.22 gang enhancement and the section 12022.53, subdivision (e)(1) firearm enhancement on the murder and mayhem counts, (3) the gang enhancement must be reversed because the prosecution's expert relied on inadmissible hearsay, and (4) recent changes to section 654 pursuant to Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1) (Assembly Bill 518) require remand so that the trial court can exercise its discretion to stay or impose the maximum sentence.

We vacate the gang (§ 186.22) and firearm (§ 12022.53, subd. (e)(1)) enhancements on the murder and mayhem counts, and remand to allow a trial on those enhancements pursuant to Assembly Bill 333. In all other respects, the judgment is affirmed, including the conviction for first degree murder.

2

## FACTUAL AND PROCEDURAL HISTORY
### *Murder of J.M.*

In December 2017, Los Angeles Port Police Officer Alfonso Garcia discovered that his firearm and loaded magazines were stolen from his truck. The officer found a small flashlight that did not belong to him.

Four days later, a witness heard a commotion near his backyard and saw J.M., a member of the White Fence gang, running through an alley. The witness saw a black two-door Infiniti G35 stop outside the backyard and a man get out of the passenger side. The passenger was later identified as codefendant Junior Rivera, a member of the rival Boyle Heights 13 gang. Rivera chased J.M. and fired a gunshot; J.M. fell. Rivera then approached "close range" to J.M., stood over him, and shot him four or five times in the back. Rivera ran back to the car and drove away.

After being shot, J.M. began taking his clothes, socks, and shoes off, saying that he felt hot. He screamed for help. When police officers arrived, J.M. was still alive and "rolling around and . . . moaning in pain." J.M. ultimately died from multiple gunshot wounds.

A medical examiner testified that J.M. had a "graze" exit wound on his right hip, an exit wound near an armpit, one entry gunshot wound on the left hip, an entry gunshot wound on the right back near the spine with an exit wound on the right shoulder, an entry and exit wound inches away from each other, and an entry wound on the buttock (the bullet was recovered from the hip joint).

3

*Arrest and investigation*

Surveillance cameras near the site of the shooting recorded J.M. walking through an alley and the Infiniti driving through a minute later. The footage captured the license plate numbers on the Infiniti. Two days later, Lezama was arrested at his home as he was getting into his black Infiniti. His license plate numbers matched the ones from the surveillance video.

During a search of Lezama's home, officers found a notebook with Boyle Heights 13 gang-related graffiti in it.

Lezama was placed in a cell with an undercover agent. Lezama told the agent that he was 13 years old when he became a gang member, but "got out" of the gang about nine months before the shooting. He showed the agent a "BHTS" tattoo on his head. He said he was shot by a White Fence gang member two years prior and hated those gang members.

Lezama told the agent he had a two-door Infiniti G35. On the day of the shooting, he wanted to drive around to look for White Fence gang members and he "forced" Rivera to go with him. While driving, they saw a person with a White Fence gang tattoo. He said Rivera was the shooter and used a gun he stole from a "cop car." Lezama said he did not get out of his car during the shooting.

Rivera was arrested the next day. He was placed in a cell with an undercover agent and told the agent "I'm going down for murder." He said the shooting happened "a couple days ago" and his "stupid ass homie got caught and now everybody else is getting caught." He believed his companion "ratted [him] out," and said the plan was his companion's idea.

Rivera said his companion was arrested at his home. He said he "told his stupid ass to get rid of that car, and he still

4

wanted to drive it." He said his companion drove a "two-door Infinit[i]" and "there aren't too many of those" in Boyle Heights.

Rivera said the shooting took place in the "White Fence's neighborhood." Rivera said he used a "cop gun" he stole from a "cop car" in Highland Park. He acknowledged the victim died. When asked about the gun, Rivera said he "got rid of [the gun] already." Rivera said much of his gang "went their own way" and that the remaining 15 members were "over here . . . putting in their work."[2]

After learning Rivera used a firearm that was stolen from a police officer, officers investigated the burglary of Officer Garcia's gun and ammunitions. Officer Garcia provided the officers with two spent cartridges to compare to the bullet fragments and cartridges found near J.M.'s body. A forensic analysis revealed the cartridges provided by Officer Garcia and the cartridges from the shooting were fired from the same gun. The officers also conducted a D.N.A. analysis on the flashlight found in Officer Garcia's car. The analysis showed D.N.A. matching Rivera's D.N.A. on the flashlight.

*Statements from Vargas and Lizarraga*

Natalie Vargas knew Lezama and Rivera. She believed Lezama was a Boyle Heights 13 gang member because of the "BHTS" tattoo on his head. Vargas met with Rivera the day after the shooting. Rivera told her that he, Lezama, and another companion, Arturo Lopez (known as "Boxer"), were driving in Lezama's car on the day of the shooting when they saw a person with a White Fence face tattoo. When Lopez asked where that person was from, the person replied, "White Fence." Rivera said

---

[2] "Putting in work" means to commit crimes for the gang, which includes a "shooting, a robbery, or a murder."

5

they shot the person. Rivera told Vargas that he and Lopez were both shooters and that the shooting was Lezama's idea. He said that he used a stolen "cop's gun."

Alma Lizarraga was previously in a romantic relationship with Lopez. During an interview with police officers, she said Lezama, Rivera, and Lopez went "cruising." Lezama and Rivera were in Lezama's car and Lopez drove another car. Rivera identified a White Fence gang member by his tattoo, and he shot him.

*Gang expert testimony*

A gang expert testified he was assigned to monitor gangs, including the Boyle Heights 13 and White Fence gangs. He explained that these gangs have a "rivalry," which stem from a fight over territory. The Boyle Heights 13 gang controlled a "very small" area and had approximately 20 members. Their territory was located within the territory controlled by the White Fence gang. The White Fence gang controlled a large area and had approximately 350 members. J.M.'s murder occurred within the White Fence territory.

Five months before J.M.'s murder, the expert participated in the arrest and investigation of a stabbing of another Boyle Heights 13 gang member, Ryan Ramirez, perpetrated by multiple White Fence gang members. The stabbing occurred at a location within "disputed [gang] territory."

The expert testified the primary activities of the Boyle Heights 13 gang include "weapon possession, vandalism, grand theft auto" and robberies. He knew Lezama and Rivera through past contacts. He knew Lezama's gang moniker was "Goofy," and Rivera's moniker was "Minor." He was also familiar with Lopez

6

("Boxer") and Ramirez ("Puppy"). He opined that all four of these individuals were Boyle Heights 13 gang members.

The expert identified Lezama in photographs in which he posed with several Boyle Heights 13 gang members. He was familiar with the gang members in the photographs and had arrested some of them. In one photograph, Lezama and five other gang members held up hand signs associated with the Boyle Heights 13 gang.

The prosecution presented several photographs of Lezama's tattoos, including a "BHTS" tattooed on Lezama's stomach and the back of his head. The expert testified these tattoos were associated with the Boyle Heights 13 gang. Lezama also received a new tattoo while he was awaiting trial. The expert opined that getting a new gang tattoo was evidence of his "full intent to remain active in the gang."

The prosecution presented the expert with evidence of predicate offenses of two Boyle Heights 13 gang members. The evidence included certified court records establishing a 2015 weapon possession conviction for Ryan Ramirez and a 2016 concealed firearm conviction for Ricky Valencia, two fellow gang members.

The expert opined that based on a hypothetical with facts similar to J.M.'s murder, the murder was committed to benefit the Boyle Heights 13 gang. He opined the murder was perpetrated by the gang because two of its members were "together when they committed the crime." He also opined the murder benefited the gang: "[T]his crime is a perfect example of how it benefits the gang. It instills fear and intimidation within the community. It makes it known to other gang members and rival gang members that this gang is willing to commit these

7

ruthless acts of violence. And it enhances their gang's reputation overall as one that is violent and is able and willing to commit these kind[s] of crimes."

*Verdict and sentencing*

Before trial, Lezama pleaded guilty to unlawful possession of ammunition and admitted violating probation related to a conviction for evading an officer in another case.

After trial, the jury found Lezama guilty of aiding and abetting first degree murder and aiding and abetting simple mayhem. The jury also found true the allegations that Lezama committed those crimes to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that a principal, his accomplice Rivera, personally and intentionally used a firearm, causing death (§ 12022.53, subd. (e)(1)).

For the murder conviction, the trial court sentenced Lezama to 50 years to life (25 years to life for murder, plus 25 years to life for the § 12033.53, subd. (e)(1) firearm enhancement) and stayed the gang enhancement. The court stayed the punishment for simple mayhem pursuant to section 654. The court also sentenced Lezama to a two-year consecutive term for unlawfully possessing ammunition, and a consecutive eight-month term for evading a police officer.

DISCUSSION

*Sufficiency of evidence for mayhem*

Lezama challenges the simple mayhem conviction because there was insufficient evidence: (1) J.M. suffered a permanent disfiguring injury and that (2) J.M. was maimed while alive. We disagree because substantial evidence supports the jury's verdict.

To determine whether substantial evidence supports the mayhem conviction, we review the whole record to determine

8

whether a rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt.  We review the evidence in the light most favorable to the prosecution, drawing all inferences in support of the judgment.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87 (*Manibusan*).)  Because the jury is in the best position to weigh the evidence presented, we will not reweigh the evidence.  "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial."  (*People v. Holt* (1997) 15 Cal.4th 619, 669.)  We will not reverse "'"unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.  [Citation.]' [Citation.]"  (*Manibusan*, at p. 87.)

To convict a person of simple mayhem, the prosecution must prove the person "unlawfully and maliciously deprive[d] a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip."  (§ 203.)  Simple mayhem, unlike aggravated mayhem (§ 205), does not require proof of a specific intent to cause a disabling or disfiguring injury.  (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 832-833 (*Ferrell*).)  "'"[T]he modern rationale of the crime may be said to be the preservation of the natural completeness and normal appearance of the human face and body"'" and to "'protect[] the integrity of the victim's person.' [Citations.]"  (*People v. Santana* (2013) 56 Cal.4th 999, 1004 (*Santana*).)

Here, the mayhem conviction was based on the theory that the multiple close-range gunshot wounds inflicted a disfiguring injury.  "Disfigurement of the body "'impairs or injures the beauty, symmetry or appearance of a person or thing . . . [or]

9

renders unsightly, misshapen or imperfect or deforms in some manner.'" [Citation.]" (*People v. Romero* (2019) 44 Cal.App.5th 381, 387 (*Romero*).) To prove mayhem based on a disfiguring injury, the injury must be permanent. (*Santana, supra*, 56 Cal.4th at p. 1007; *Romero*, at p. 387.) An injury may be considered legally permanent even if cosmetic repair may be medically feasible. (*People v. Hill* (1994) 23 Cal.App.4th 1566, 1575.)

Several cases have recognized that an injury sustained from a close-range gunshot may constitute a disfiguring or disabling injury sufficient for mayhem. For instance, in *Manibusan, supra*, 58 Cal.4th at page 88, our Supreme Court upheld an aggravated mayhem conviction where the victim was shot from "very close range—only five to 10 feet—hitting her once in the face—her forehead—and once in the upper arm, near her face." The court held that these facts supported that the defendant intended "to cause permanent disability or disfigurement." (*Ibid.*; *Ferrell, supra*, 218 Cal.App.3d at p. 835 ["shot in the neck from close range, if not fatal, is highly likely to disable permanently"]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1226 ["Firing a gun at someone at close range, which results in the victim being paralyzed, is sufficient to constitute mayhem"]; *Santana, supra*, 56 Cal.4th at p. 1012 [three close-range gunshots fired with a .38-caliber revolver into the leg and buttock area of the victim showed the intent to inflict a "disabling injury"]; see also *People v. Bui* (2011) 192 Cal.App.4th 1002, 1006, 1015 [three gunshots with one bullet entering through the elbow and another bullet retrieved from the victim's back inflicted injuries sufficient to constitute mayhem].)

10

Here, after firing one shot from a distance, Rivera moved into close range, stood over J.M., and shot him four or five times in the back. The prosecution presented the jury with several photographs of J.M.'s body and the close-range bullet wounds, which included a "graze" exit wound on his right hip, an exit wound near an armpit, one entry gunshot wound on the left hip, an entry gunshot wound on the right back near the spine with an exit wound on the right shoulder, an entry and exit wound inches away from each other, and an entry wound on the buttock. The prosecution also presented two of the coroner's diagrams, one which showed only the entry and exit wounds, and the other one showed all the wounds. Moreover, as the jury looked at the photographs and diagrams, a medical examiner described the injuries.

Lezama contends that proof "of permanent disfigurement in the form of significant scarring [was] essential to the mayhem conviction." Assuming that proof of scarring was essential, a jury could reasonably infer from the evidence that the gunshot wounds here would have resulted in scarring, which satisfies the requirement for a disfiguring injury. (*Romero*, *supra*, 44 Cal.App.5th at p. 387.) "'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" [Citation.] "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled

with a contrary finding does not warrant the judgment's reversal. [Citation.]" [Citation.]'" (*Manibusan, supra,* 58 Cal.4th at p. 87.)

*Romero, supra*, 44 Cal.App.5th at page 387, is instructive. There, a victim was stabbed eight times, but there was no direct evidence of scars. Nonetheless, the Court of Appeal concluded that a reasonable trier of fact "could infer from the evidence presented that [his] wounds resulted in scars," which satisfy the disfigurement requirement of mayhem. (*Ibid.*)

Similarly here, the jury could reasonably infer based on the photographs of the injuries, testimony regarding the way J.M. was shot in close range, and the medical examiner's testimony, that the injuries would have resulted in permanent scarring.[3]

Lezama also contends the prosecution presented no evidence that J.M. was disfigured while he was alive. Lezama argues that because mayhem is intended to protect against the "emotional, economic, and physical problems an individual . . . likely faces in their remaining years," there must be proof that mayhem was committed on a living person.

Although "[m]ayhem requires a live victim," courts have not pronounced that a victim must remain alive for a specific amount of time. (*People v. Kraft* (2000) 23 Cal.4th 978, 1058 (*Kraft*).) In *Kraft*, our Supreme Court determined whether substantial evidence supported a mayhem conviction where the defendant argued the record lacked evidence that the victim was alive when he was emasculated. There, when the police officers found the victim's body, the victim had no pulse or respiration.

---

[3] To the extent Lezama argues the prosecutor misstated the law during his closing argument, that argument is forfeited because defense counsel did not object at trial. (*People v. Dykes* (2009) 46 Cal.4th 731, 770.)

The front of the victim's neck bore ligature marks, and he was emasculated.  After an autopsy, the pathologist concluded the victim died from ligature strangulation, and when the victim was emasculated, "the bleeding was 'not that great.'" (*Id*. at p. 1004.) The pathologist believed that the victim was "'probably dead' when the injury was inflicted, although the emasculation could have occurred perimortem, or around the time of death." (*Id*. at pp. 1004-1005.)

Despite this evidence, the Supreme Court concluded there was sufficient evidence that the victim was alive at the time of emasculation.  (*Kraft, supra*, 23 Cal.4th at p. 1058.)  The court relied on the responding officer's testimony that when he discovered the body, he saw the victim's foot "move slightly" and the body was "warm to touch." (*Id*. at pp. 1004, 1058.)  The court also noted that despite the pathologist's opinion that emasculation " 'probably' occurred postmortem," there was "*some* bleeding and *some* tissue response, lending support to [the pathologist]'s testimony the emasculation could have occurred perimortem" or "around the time of death." (*Id*. at pp. 1005, 1058.)  Thus, "[t]he jury could reasonably find the elements of mayhem were present here." (*Id*. at p 1058.)

*People v. Jentry* (1977) 69 Cal.App.3d 615 also examined whether the evidence supported a finding that mayhem was committed on a live victim.  There, the victim was hit in the head multiple times with a hammer before being castrated.  (*Id*. at p. 619.)  Although the medical experts concluded that the probable immediate cause of death was brain damage from the initial hammer blows, the castration followed immediately thereafter. (*Id*. at p. 629.)  Thus, even though it was "apparent that the victim either died during the cutting or was dead before the

removal of these appendages commenced," the court nonetheless concluded that the victim's death did not render inapplicable the felony-murder doctrine, with mayhem as the underlying felony, because "the blows causing the death and the maiming took place as part of one continuous transaction." (*Ibid*.)

*Kraft* and *Jentry* suggest that while there must be evidence that the acts of mayhem occurred on a live victim, there is no additional requirement that the victim must live for a certain amount of time after the acts occur.

Here, sufficient evidence establishes that J.M. was alive after he was shot multiple times. A witness testified that J.M. began taking his clothes and socks off, said that he was hot, and screamed for help. Officers testified that J.M. was still alive and "rolling around and . . . moaning in pain." "That a contrary conclusion might also be reasonable does not compel reversal of the conviction." (*Kraft, supra*, 23 Cal.4th at p. 1058.)

Although we conclude sufficient evidence supports the jury's findings, we express our concern regarding the propriety of charging mayhem under these circumstances—where the victim died shortly after injury and the defendant was also charged, and ultimately convicted of, murder for the same acts supporting mayhem. We question whether charging a defendant of mayhem under these facts stretches the rationale and intended purpose behind criminalizing mayhem, which is to preserve and protect the appearance and integrity of the victim's person. (*Santana, supra*, 56 Cal.4th at p. 1004.) Nonetheless, we affirm on grounds that were raised; the evidence supports the conviction.

14

*Assembly Bill 333*

Lezama contends, and the Attorney General concedes, he is entitled to the ameliorative benefits of Assembly Bill 333, effective January 1, 2022. We agree.

Assembly Bill 333 amends section 186.22 in several ways. (Stats. 2021, ch. 699, § 3.) It modifies the definitions of "pattern of criminal gang activity" and "criminal street gang" and clarifies the evidence required to show a benefit to a criminal street gang. It increases the threshold for conviction of the offense and imposition of the enhancement. In addition, Assembly Bill 333 added section 1109, which provides, that if "requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases." (§ 1109, subd. (a).)

As relevant here, Assembly Bill 333 amends the law regarding predicate offenses. Now, "(1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill 333, § 3, amended § 186.22, subd. (e)(1)–(2), eff. Jan. 1, 2022.) With respect to common benefit, the new legislation explains: '[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual

15

gang rival, or intimidation or silencing of a potential current or previous witness or informant.' (Assem. Bill 333, § 3, amended § 186.22, subd. (g), eff. Jan. 1, 2022.)" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

The parties agree, as do we, that Assembly Bill 333's amendments affecting predicate offenses apply retroactively to judgments of conviction that are not yet final. (*In re Estrada* (1965) 63 Cal.2d 740, 744; *Lopez*, *supra*, 73 Cal.App.5th at pp. 344-345.)

The Attorney General concedes that "there was no evidence presented that Ramirez's or Valencia's predicate offenses benefited the gang in a way that was more than reputational" and that "remand is required." Thus, the proper remedy is to vacate the true finding on the section 186.22, subdivision (b) gang enhancement.

The Attorney General agrees vacating the section 186.22, subdivision (b) gang enhancement would also "undo the section 12022.53 subdivision (e)(1)" firearm enhancement. However, the Attorney General argues that Lezama would still be subject to the same consecutive 25-year-to-life sentencing enhancement under the jury's true finding of section 12022.53, subdivision (d). We disagree because the jury did not make a separate finding that Lezama personally discharged the firearm that killed J.M.

Section 12022.53 provides for sentencing enhancements for the use of firearms in the commission of certain felonies. Subdivisions (b) through (d) "provide punishment for offenders who *personally* use a firearm during the commission of their crimes." (*Lopez, supra*, 73 Cal.App.5th at p. 347, emphasis added.) As relevant here, subdivision (d) provides that a person who "*personally and intentionally* discharges a firearm" and

16

proximately causes great bodily injury or death "shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (Emphasis added.)

However, section 12022.53, subdivision (e)(1) applies to *a principal* in the crime only if *both* of the following are met: "(A) The person violated subdivision (b) of Section 186.22" and "(B) *Any principal* in the offense committed any act specified in subdivision (b), (c), or (d)." (Emphasis added.) These "penalties may also be imposed on any person who is a principal in the offense," such as Lezama, but only "under certain gang-related circumstances." (*Lopez*, *supra*, 73 Cal.App.5th at p. 347.) And unlike subdivision (e)(1), subdivision (d) is inapplicable to non-shooters because it requires that the defendant *personally and intentionally* used a firearm for the 25-year-to-life sentencing enhancement to apply.

Here, the jury found true the allegation a *principal* discharged a firearm causing death pursuant to section 12022.53, subdivision (e)(1). But the jury did not make a true finding that Lezama "personally and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury . . . or death" pursuant to section 12022.53, subdivision (d). The parties do not dispute that Lezama was not the shooter, and that his codefendant Rivera was the shooter. Thus, the 25-year-to-life firearm enhancement must be vacated.

*People v. Lopez, supra*, 73 Cal.App.5th 327 supports this conclusion. There, Lopez was convicted of three murders of Lexing, Grant, and Robinson. The jury found true the section 12022.53, subdivision (e)(1) allegation as to all three murders. However, with respect to the murders of Lexing and Grant only, the jury separately found true that Lopez personally and

17

intentionally discharged a firearm pursuant to section 12022.53, subdivision (d).  The Court of Appeal held that the subdivision (e)(1) allegation as to each victim must be vacated pursuant to Assembly Bill 333.  Thus, the 25-year-to-life sentencing enhancement imposed for the murder of Robinson was properly vacated.  Only the two consecutive 25-year-to life sentencing enhancements for the murders of Lexing and Grant could remain intact because the jury separately found that Lopez personally used a firearm in the commission of those murders within subdivision (d).

Like *Lopez*, we must vacate and remand as to the section 12022.53, subdivision (e)(1) allegation.  Because the jury did not make a separate true finding that Lezama personally discharged a firearm, and because the evidence does not support the allegation, Lezama is not subject to the 25-year-to-life enhancement pursuant to section 12022.53, subdivision (d).  On remand, the trial court shall allow the prosecution the opportunity to retry the gang and firearm enhancements to meet its burden of proof pursuant to Assembly Bill 333's new requirements.  (See *Lopez*, supra, 73 Cal.App.5th at p. 346.)

Lezama contends that we must reverse his murder and mayhem convictions because those charges were not tried separately from the gang enhancement, as required by section 1109.  (*People v. Burgos* (2022) 77 Cal.App.5th 550, 568-569, review granted July 13, 2022, S274743.)  The Attorney General argues that section 1109 does not apply retroactively.  (*People v. Perez* (2022) 78 Cal.App.5th 192, review granted Aug. 17, 2022, S275090; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64-65, review granted Aug. 17, 2022, S275341.)  There is a split of authority on whether section 1109 applies retroactively to

18

nonfinal cases. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208.) We need not decide this issue. Even assuming retroactivity, Lezama cannot show it is "reasonably probable" he would have obtained a more favorable result if his trial had been bifurcated. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Tran*, at pp. 1209-1210 [applying *Watson*]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 (*E.H.*).)

First, some of the gang evidence would have been admissible because it was relevant to the underlying offenses. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 ["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].) The gang evidence here was relevant to prove motive—the prosecution presented evidence that the murder was related to a gang rivalry between the Boyle Heights 13 and White Fence gangs and that the murder was retaliatory.

Second, there was overwhelming evidence supporting the convictions. With respect to murder, both Lezama and Rivera admitted to the informant that they participated in the murder. Lezama also admitted that he owned the Infiniti and that it was his idea to look for White Fence gang members. Furthermore, Vargas and Lizarraga stated that Lezama was involved in the shooting. With respect to the mayhem conviction, the evidence showed that the shooter stood over J.M. and shot him multiple times. The evidence included several photographs of the injuries and the medical examiner's testimony describing the wounds. "Under these circumstances, we conclude that the jury's verdict was based on the evidence, not improper bias, and that

bifurcation would not have helped [Lezama]." (*E.H., supra,* 75 Cal.App.5th at p. 480.)[4]

*Assembly Bill 518*

Lezama contends he is entitled to the ameliorative benefits of the changes to section 654 pursuant to Assembly Bill 518. The Attorney General concedes Assembly Bill 518 is retroactive. We agree. (*In re Estrada, supra,* 63 Cal.2d at p. 744; *People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

When the trial court sentenced Lezama, former section 654 provided that an "act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).) Assembly Bill 518, effective January 1, 2022, amended section 654 to provide that where an act or omission is punishable by different provisions, the defendant "may be punished under either of such provisions." (§ 654, subd. (a).) Thus, where section 654 applies, trial courts now have discretion to determine which sentencing provision to apply.

Because we vacate the gang and firearm enhancements and remand the matter pursuant to Assembly Bill 333, the court will

---

[4] Although the parties agree the new evidentiary provisions in Assembly Bill 333 retroactively apply, the Attorney General contends there was sufficient evidence that the Boyle Heights 13 gang was an "ongoing, organized association" pursuant to section 186.22, subdivision (f). Given our decision to remand, we need not address this issue. Moreover, we need not address Lezama's contention regarding the gang expert's reliance on inadmissible hearsay nor his contention that his counsel rendered ineffective assistance of counsel by failing to object.

20

have the opportunity to consider all counts and the changes to section 654 pursuant to Assembly Bill 518 upon resentencing. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425.)

DISPOSITION

The gang enhancement pursuant to section 186.22, subdivision (b)(1)(C) and firearm enhancement pursuant to section 12022.53, subdivision (e)(1) on the murder and mayhem counts are vacated. The matter is remanded to allow the prosecution the opportunity to prove these enhancements pursuant to Assembly Bill 333. At resentencing, the trial court shall exercise its discretion pursuant to Assembly Bill 518. The judgment is otherwise affirmed, including the first degree murder conviction.

NOT TO BE PUBLISHED.


BALTODANO, J.


I concur:


GILBERT, P. J.

YEGAN, J., Concurring and Dissenting:

I concur with the majority opinion except that portion of the opinion which finds the evidence sufficient to support the mayhem conviction. I would reverse that conviction. Where, as here, the victim is shot multiple times at close range, there will arguably be some permanent disfigurement if the victim survives. He did not. In fact, he died within the hour of the shooting. The potential mayhem conviction died with him. The majority cites and relies upon cases which have upheld murder and mayhem convictions upon the same victim at approximately the same time. But as we have previously indicated: "A case is not authority for propositions not considered." (*People v Chavez* (2020) 54 Cal.App.5th 477, 480; see also *People v. Avila* (2006) 38 Cal.4th 491, 566.) The cases cited by the majority opinion did not consider and analyze the issue presented by this appeal. They do not dictate affirmance of the mayhem conviction.

NOT TO BE PUBLISHED.

YEGAN, J.

Eleanor J. Hunter, Judge

Superior Court County of Los Angeles

_____

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.