[No. A046054. First Dist., Div. Three. Mar. 12, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
CLISTIE MAE FERRELL, Defendant and Appellant.

830

COUNSEL

Robert K. Calhoun, Jr., and Louisa Havstad, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

---

## Opinion

**STRANKMAN, J.**—This case arises out of a callous attack by appellant Clistie Mae Ferrell on Tabatha Perreira, which left Perreira permanently paralyzed. Appellant came to Perreira's home, shot Perreira's father in the knee, and shot Perreira in the neck. Perreira had never previously seen appellant. The principal question in this appeal is the sufficiency of the evidence to support appellant's conviction of aggravated mayhem as defined in Penal Code section 205, which prohibits intentionally causing permanent disability or disfigurement of another.[1]

### Factual and Procedural Background

Appellant was convicted by a jury of attempted second degree murder (§§ 187, 664), aggravated mayhem (§ 205), first degree burglary (§§ 459, 460.1), and two counts of assault with a firearm (§ 245, subd. (a)(2)). The jury also found several personal firearm use and infliction of great bodily injury enhancement allegations to be true. (§§ 12022.5, subd. (a), 12022.7.)

The evidence at appellant's trial was as follows. One July evening in 1988, Perreira was in the kitchen of her Antioch apartment, talking on the telephone. Her parents and a friend were visiting. Perreira's niece, Bonnie Keifer, arrived in the parking lot adjoining the apartment. Appellant approached Keifer and asked if she was Tabatha. When Keifer said no, appellant asked, "Do you know where Tabatha lives?" Again, Keifer said no. Appellant then asked where apartment 1604 was; Keifer asked why appellant wanted Tabatha. Appellant answered, "A friend from jail sent us." Another woman was with appellant, and a third woman sat in the car in which appellant had arrived.

Appellant went up the stairs to Perreira's apartment, followed by Keifer and one of appellant's companions. Perreira's mother, Rosanne Keifer, was on the porch, calling for her grandchildren. Mrs. Keifer said, "Tabatha, somebody's here for you." Perreira looked up and saw appellant standing in the open doorway. Appellant told Perreira to get off the phone. Perreira

---

[1] All further statutory references are to the Penal Code.

said, "What do you want with me? I haven't done nothing wrong." Perreira did not know appellant and had never seen her before.

Appellant entered the apartment, followed by Mrs. Keifer. Appellant jerked the telephone out of Perreira's hand. Mrs. Keifer yelled; appellant spun around and pointed a gun at her chest. Appellant threatened, "If you move, I'll kill you." Mr. Keifer had also followed appellant; she then pointed the gun at him and told him not to take another step. When Mr. Keifer kept moving, appellant lowered the gun and shot him in the knee.

Perreira dropped to the floor behind a chair, but her head and neck remained in view. Immediately after shooting Mr. Keifer, appellant shot Perreira in the neck, from a distance of about two feet. The bullet severed Perreira's spine and resulted in severe partial paralysis.

Throughout the entire incident, which lasted only a few seconds, appellant did not appear to be either nervous or afraid; Perreira thought appellant seemed angry.

Linda Beasley, who knew appellant, drove her to Perreira's apartment at appellant's request. Beasley said she did not know why appellant wanted to go to that location. When appellant went up to the apartment, Beasley waited in the car and sent a third woman who was with them, Michelle Lujan, to find out if appellant planned to stay at the apartment. The two women returned to the car shortly thereafter. Appellant had been cheerful, but now seemed pale and upset. Appellant said that they had "come at her" and that nobody was supposed to be hurt.

## SPECIFIC INTENT TO COMMIT AGGRAVATED MAYHEM

■ When the definition of a crime consists of the description of a particular act, with no reference to intent to do a further act or achieve a future consequence, the offense is a general intent crime and the question is whether the defendant intended to do the prohibited act. On the other hand, when the definition refers to the intent to do some further act or achieve some additional consequence, the offense is a specific intent crime. (*People* v. *Daniels* (1975) 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232].)

■ Simple mayhem as defined in section 203 is a general intent crime, except under circumstances which we will discuss later. (*People* v. *Sears* (1965) 62 Cal.2d 737, 744-745 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Campbell* (1987) 193 Cal.App.3d 1653, 1668 [239 Cal.Rptr. 214]; *Goodman*

v. *Superior Court* (1978) 84 Cal.App.3d 621, 624 [148 Cal.Rptr. 799].)[2] A violation of section 203 is punishable by two, four, or eight years. (§ 204.)

In contrast, aggravated mayhem as prohibited by section 205 includes an intent requirement and is punishable by an indeterminate life term sentence. That section, which was enacted in 1987, provides in pertinent part: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, *intentionally* causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. . . ." (Stats. 1987, ch. 785, § 1, No. 9 West's Cal. Legis. Service, p. 220, italics added, No. 3 Deering's Adv. Legis. Services, p. 2278.) When compared to the language of section 203, the unambiguous language of section 205 compels the conclusion that the specific intent to cause the maiming injury is an element of aggravated mayhem.

Legislative history confirms that interpretation of the elements of aggravated mayhem. As originally introduced in February 1987, the proposed statute included an intentional or reckless causation element (Sen. Bill No. 589 (1987-1988 Reg. Sess.)); the bill was amended more than once, and its final version, as signed by the Governor in September 1987, deleted the reckless state of mind provision (Stats. 1987, ch. 785, No. 9 West's Cal. Legis. Service, p. 219, No. 3 Deering's Adv. Legis. Service, p. 2278).

■ As the statute mandates, the jury in the present case was instructed that a conviction of aggravated mayhem required proof that appellant intentionally and unlawfully caused another person to sustain permanent disability or disfigurement. Nevertheless, appellant contends the evidence is insufficient to support her conviction of that offense. She concedes that the circumstances surrounding her act and the manner of the shooting demonstrate an intent to inflict a violent injury, even an intent to kill. She argues, however, that those same circumstances do not establish the specific intent to cause permanent disability or disfigurement.

Respondent argues that proof of specific intent to kill is, as a matter of law, proof of intent to cause permanent disability or disfigurement, because "[d]eath is the most permanent disability that exists." However, we need not evaluate that theory to decide this case. Regardless of whether one intent is subsumed within the other, it is apparent that a defendant may

---

[2] Section 203 provides: "Every person who unlawfully and maliciously deprives a human being of a member of his [or her] body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful. That a defendant may simultaneously entertain both objectives is not a novel conclusion, as is illustrated by an English case decided over 175 years ago, *Rex v. Woodburne and Coke,* XVI State Trials 54 (Howell ed. 1812). Defendants Coke and Woodburne were charged with intentionally maiming and disfiguring one Edward Crispe. The evidence indicated that Coke paid Woodburne to kill Crispe, and that Woodburne tried to kill Crispe with a hedging-hook, but only succeeded in slitting his nostril and inflicting other facial wounds. Coke argued that he could not be convicted of the crime charged because his intent was only to kill Crispe, not to maim or disfigure him. But the court declared that the intent to kill did not exclude the intent to maim and disfigure, and that the question of Coke's intent was one of fact for the jury, to be determined by considering all the evidence, including the nature of the instrument used and the manner of perpetrating the crime. (*Id.,* at pp. 79-80, 92.)

The question in this case, then, is whether the evidence, which appellant concedes is sufficient to establish that she intended to kill her victim, is also sufficient to establish the intent to permanently disable or disfigure that victim.

■ "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. [Citations.]" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698].) A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors. (*People v. Miller* (1977) 18 Cal.3d 873, 884 [135 Cal.Rptr. 654, 558 P.2d 552].) As in any case in which the sufficiency of the evidence is questioned, this court must review the record in the light most favorable to the judgment, and presume in support of that judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. Fosselman* (1983) 33 Cal.3d 572, 578 [189 Cal.Rptr. 855, 659 P.2d 1144].) When the evidence is sufficient to justify a reasonable inference that the requisite intent existed, the jury's finding of that intent will not be disturbed on appeal. (*People v. Tolstoy* (1967) 250 Cal.App.2d 22, 25 [58 Cal.Rptr. 148].)

■ As no court has as yet considered the nature of the evidence necessary to satisfy the intent requirement of section 205, appellant relies primarily on those cases involving felony murder with simple mayhem as prohibited by section 203 as the underlying felony. In such cases the specific intent to commit mayhem must be proved, even though a violation of section 203 is ordinarily a general intent crime. (*People v. Anderson* (1965) 63 Cal.2d 351, 358-359 [46 Cal.Rptr. 763, 406 P.2d 43]; *People v. Sears, supra,* 62

Cal.2d at pp. 744-745; *People* v. *Campbell, supra*, 193 Cal.App.3d at p. 1668.)

We note first that the specific intent to commit mayhem under section 203 is not necessarily identical to the intent required for a violation of section 205. Section 205 broadly prohibits intentionally causing "permanent disability or disfigurement . . . or depriv[ing] a human being of a limb, organ, or member of his or her body," while the injuries which are the subject of section 203 are more narrowly and precisely defined.

Despite the differences in the statutory language, however, the standards articulated in cases involving felony-murder mayhem are instructive here. Evidence which shows no more than an "indiscriminate attack" is insufficient to prove the specific intent to commit mayhem under section 203. (*People* v. *Anderson, supra*, 63 Cal.2d at p. 359; *People* v. *Sears, supra*, 62 Cal.2d at p. 745.) Furthermore, specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately. (*People* v. *Campbell, supra*, 193 Cal.App.3d at p. 1668.) In *Campbell*, for example, the murder victim sustained multiple facial lacerations and skull fractures, the latter inflicted with a brick. Most of the serious injuries were on the right side of the victim's face, and her ear was torn. The court held that the evidence indicated a controlled and directed attack to the head and face, rather than a random attack to her entire body, and supported an inference that the defendant intended to disfigure the victim's face, including her right ear. That evidence was sufficient to support a felony-murder mayhem instruction. (*Id.*, at pp. 1668-1669.)

We apply those standards to the evidence in appellant's case. Viewed in the light most favorable to the judgment, that evidence established that this bizarre shooting was a cold and deliberate attack. Appellant was a stranger to Perreira. Nevertheless, appellant came looking for her victim by name. She knew Perreira's address, and stated that she had been sent by a friend from jail. Appellant knocked the phone from Perreira's hand, effectively preventing her from calling for help. She threatened to kill Perreira's mother and pointed the gun at her chest; when Perreira's father moved toward appellant, she calmly and deliberately lowered her aim and shot him in the knee. She quickly then turned and shot Perreira once in the neck, from short range. Once Perreira was down, appellant did not fire additional shots at her, to make certain that she was dead; instead, appellant was apparently satisfied with the result of her single shot. It takes no special expertise to know that a shot in the neck from close range, if not fatal, is highly likely to disable permanently. Appellant's shooting of Per-

reira was not an indiscriminate, random attack on her body; instead, the shooting was directed and controlled. From all this evidence, the jury could reasonably have inferred that appellant intended both to kill Perreira, and, if she did not die, to disable her permanently. Substantial evidence supports the jury's verdict.

## SENTENCING ERROR

■ Appellant was sentenced to a determinate term of 10 years, with a consecutive life sentence for the aggravated mayhem conviction. To set the determinate term, the court selected as the principal term the upper term (four years) for the conviction of assault on Robert Keifer (count four); it added a consecutive enhancement for the infliction of great bodily injury pursuant to section 12022.7 (three years); it then added a second consecutive enhancement for firearm use pursuant to section 12022.5 (two years).

Appellant contends that the imposition of the two enhancements on the single offense is prohibited by section 1170.1, subdivision (e). That subdivision provides in pertinent part: "(e) When two or more enhancements under Sections . . . 12022.5 . . . [and] 12022.7 . . . may be imposed for any single offense, only the greatest enhancement shall apply; . . ." Respondent concedes the error, and asks that the two-year enhancement on count four be stayed.

## DISPOSITION

The judgment is modified to stay execution of the two-year enhancement imposed pursuant to Penal Code section 12022.5 on count four. As modified, the judgment is affirmed.

Merrill, J., concurred.

White, P. J., concurred in the judgment.