Filed 6/2/23  P. v. Titus CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BYRON DEAN TITUS, JR.,<br><br>        Defendant and Appellant. | A164999<br><br>(Humboldt County<br>Super. Ct. No. CR2100262) |

A jury convicted Byron Titus of multiple felonies, including attempted murder and aggravated mayhem.  He was sentenced to an aggregate prison term of 50 years to life plus 32 years, 8 months.  On appeal, Titus contends his mayhem conviction must be reversed because the trial court failed to instruct the jury regarding simple mayhem as a lesser included offense.  He contends further that there were multiple sentencing errors, some of which the People concede on appeal.  We affirm Titus's convictions and remand for resentencing.

## FACTUAL AND PROCEDURAL SUMMARY

### I.  The Trial Evidence

#### A.  The Prosecution Case

The incidents that led to charges against Titus occurred on a parcel of property bordering Highway 96 in Hoopa, California, where Carmelita R. and her boyfriend Joshua S. lived in their RV.  The landowner, Tom C., lived in a

1

house adjacent to where the RV was parked. Titus was in a romantic relationship with Tom's daughter Chelsea, and they also lived on the property, in a mobile home located down the hill from the house. Prior to the incident, Titus, Carmelita, and Joshua were friends, who socialized on a regular basis.

One day in late December 2020, Carmelita and Joshua went out for the morning, leaving their dogs locked inside the RV. When they returned, the door to the RV was open, the dogs were running "amok," and Joshua's gun was missing. Carmelita and Joshua suspected that someone they knew stole the gun because the dogs had allowed the person to get inside. They came to suspect Titus because they had only a small circle of friends who spent time with them at the RV, and Titus was their only friend who stopped interacting with them after the gun was stolen. Also, Titus had expressed an interest in Joshua's gun and offered to buy it more than once, but was told it was not for sale as it was Joshua's prized possession.

On January 5, 2021, Carmelita and Joshua shared their suspicion about Titus with Tom C. because they really wanted to get the gun back. Later that night, Carmelita went to her aunt's house while Joshua and some friends played cards in the RV. Carmelita returned at around 2:00 or 3:00 a.m. on January 6, and after the card players left, she and Joshua decided to sleep on the couch at the front of the RV. Before they fell asleep, someone knocked on the door. When Carmelita answered, someone "pushed" a sawed-off shotgun in her face and tried to push his way up the steps into the RV. The assailant had partially covered his face with a bandana, but his eyes were angry, and his voice was familiar. At trial, Carmelita was unable to recall what the man said. She testified that when she realized he was trying to shoot Joshua, whose was lying on the couch with his back to the door, she

2

alerted Joshua.  Then she grabbed the gun with both hands and struggled with the assailant, trying to keep him from getting further inside.  She managed to push him out the door, and he fell over a propane tank.  Carmelita also stumbled outside, and at that point she saw Titus's face because his bandana had come off and Tom C.'s porch light was on.

Titus still held the shotgun, so Carmelita headed for cover in her RV.  When she was on the outside steps leading to the door, she turned and saw Titus pointing his gun at her kitchen window and tracking the figure of Joshua as he moved to the back of the vehicle.  After Carmelita stepped through the door into the RV, a shot was fired, and Joshua screamed.  He spun around and grabbed his face, covering his injury.  Carmelita gave him a blanket to staunch the bleeding.  Then she realized Titus was back in the RV, and she was temporarily too stunned to move as Titus said something to Joshua.  Joshua spit out "a pretty big piece of just flesh and blood particles, pellets and everything" before saying something back.  Then Titus fled, and Carmelita followed until he disappeared down the hill and the light went off in Chelsea's mobile home.  Carmelita returned to Joshua and called 911.

Meanwhile, Tom C.'s next door neighbor, Ms. N., heard the gunshot and pleas for help.  She was standing outside her house when a man approached her while carrying a shotgun.  Ms. N. recognized Titus, who she knew well.  He asked her for a ride, telling her something like "[t]hey want to call me a liar, I'll shoot all of them over there."  Then they heard sirens, Titus asked for a way out, and Ms. N. told him how to get away.

Officers from the Sheriff's department arrived at Tom C.'s property at about 3:57 a.m. on the morning of January 6, where they were met by a

frantic Carmelita who reported that Titus shot Joshua.[1] The officers obtained medical assistance for Joshua and arranged for a relative to pick up Carmelita, but they did not have the resources to conduct an immediate widespread search for Titus. Subsequently, officers obtained a warrant to access location data for Titus's phone. On January 25, 2021, Titus was arrested at a Wal-Mart parking lot.

Joshua spent nine days in the hospital, followed by several months of outpatient treatment from multiple doctors, including eye and brain specialists. His injuries include a scar that crosses his entire face, other scars on his face caused by pellets, a sunken eye, loss of vision in that eye, and seizures that affect cognition. In the immediate aftermath of the shooting, the seizures were frequent and severe. At the time of trial more than a year later, they occurred once every couple of weeks.

## B. The Defense Case

Titus, the sole defense witness, confirmed that he was living with Chelsea C. in January 2021, but testified that he did not know Carmelita R. well, and that he did not spend much time with Joshua S., although he considered Joshua a friend. The two men had first met before Titus went to prison in 2011 for committing burglary and assault with a deadly weapon. Titus testified that he was released from prison in September 2020 and met Chelsea the following month.

Titus recalled that on January 5, 2021, he spent the day working at a construction job, stopped at a store on the way home to purchase jewelry for Chelsea, and then went home and got engaged. Titus spent the remainder of that night with Chelsea's family before they went to bed in Chelsea's trailer

---

[1] When Carmelita identified Titus as the assailant, she referred to him by his nickname, which is "Beans."

at around 2:00 or 3:00 a.m.  Later, on the morning of January 6, Titus was getting ready for work when his brother called to say that he had heard Titus shot someone in the yard the previous night and that the police were looking for him.  This was "news" to Titus and he "panicked."  He called the tribal police and Sherriff's office and waited for two days for somebody to come and find him at Chelsea's home.  Then he left to go stay with family because he did not want to get Chelsea in trouble and because he wanted to see an uncle who was dying.  Titus denied shooting Joshua and testified that he was innocent of all charges against him.  He also denied going up to Ms. N.'s house on the morning of the shooting.

Titus testified that in January 2021, he was in compliance with a term of his parole that precluded him from possessing a firearm.  He recalled one day when he was outside Chelsea's home chopping wood, Joshua came down and tried to show him his gun, but he told Joshua that he could not be around "that" or he would be sent to prison, and he asked Joshua "to get out of the yard."  That was the only time Joshua tried to show him a gun.  Titus testified that he did not even know he had been accused of stealing Joshua's gun until he was brought to court.

Titus admitted under cross-examination that his prior convictions for residential burglary and assault involved kicking down somebody's door and going into their house with a shotgun.  The prosecutor asked if it was true that on the same day Titus committed those prior offenses, he fired his shotgun at another person.  Titus denied the allegation, testifying that the gun had accidentally discharged without him firing a shot.  Titus told the jury that he had never pointed a shotgun at another person, explaining, "I was taught, if you point a gun at somebody, use it, and that's something I don't do."

## II. Trial Proceedings

The evidence summarized above was presented at Titus's March 2022 jury trial. On March 16, the jury convicted Titus of the following offenses: attempted murder (Pen. Code, §§ 187, subd. (a), 664;[2] count 1); aggravated mayhem (§ 205; count 2); burglary (§ 459; count 3); two counts of assault with a firearm (§ 245, subd. (a)(2); counts 4 & 6); and shooting at an inhabited dwelling (§ 246; count 5). The jury also found true allegations that Titus personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d); counts 1 & 2), personally used a firearm (§ 12022.5, subd. (a); counts 3 & 4), and caused great bodily injury (§ 12022.7, subd. (a); counts 4 & 5). The trial court found that additional enhancement allegations for a prior strike conviction (§§ 667, subd. (b)–(i), 1170.12, subd. (c)(1)) and a prior serious felony conviction (§ 667, subd. (a)(1)) were true, based on admissions Titus made while testifying at trial.

Titus was sentenced on April 12, 2022. The probation department recommended that the trial court impose an aggregate prison sentence of 43 years, 8 months to life plus life in prison. Confusingly, the report sets out proposed terms for each conviction and enhancement, which do not appear to coincide with department's proposed aggregate sentence.

The trial judge stated that he considered the probation report and intended to follow the department's recommendation but with modifications, and also stated that determinate terms would be doubled due to the prior strike. The court's tentative decision was to impose an aggregate sentence of 50 years to life, plus 32 years, 8 months in prison. Using mayhem (count 2) as the base term, the court intended to impose a sentence of 25 years to life plus a consecutive term of 25 years to life for personal discharge of a weapon

---

[2] Statutory references are to the Penal Code.

6

causing great bodily injury. The court then outlined the following sentences for the subordinate offenses: for attempted murder (count 1), a consecutive term of 14 years and a stayed term of 25 years to life for the enhancement; for burglary (count 3), a consecutive term of 2 years, 8 months plus a consecutive term of 2 years, 8 months for the weapon enhancement; for assault against Joshua (count 4), a concurrent 6-year term plus a stayed 4-year term for personal use of a firearm and a stayed 3-year term for causing great bodily injury; for shooting at a dwelling (count 5), a consecutive term of 3 years, 4 months plus a consecutive 3-year term for causing great bodily injury; for the assault against Carmelita (count 6), a consecutive 2-year term; and for the prior serious felony enhancement, a consecutive 5 year term.

The prosecutor agreed with the court's tentative sentence, after which Joshua's mother made a statement to the court about the impact of Titus's conduct. The defense made one objection, arguing that the prior strike and prior conviction allegations had been bifurcated and thus had not been proven, to which the court responded that Titus himself admitted the prior convictions during his testimony.

The defense submitted letters of support from Titus's mother as well as a letter Titus wrote. In addition, Titus made the following statement directly to Joshua's mother: ". . . I am sorry Josh got shot. I mean, but the truth's going to come out later. And I just want you to know it wasn't me, and the truth is going to come out. And let Josh know I am sorry for whatever happened to him, but he is going to know what is going to happen. The truth will come out. I just wanted you to know that."

After the matter was submitted, the court noted that Titus had maintained his innocence but opined that the jury concluded otherwise because two witnesses had identified him. Beyond that, the court observed

that this was a "horrible crime," and pronounced that its tentative sentence would be the sentence imposed on Titus.

## DISCUSSION

## I. Jury Instruction Regarding Simple Mayhem Was Not Required

Titus contends the trial court violated a sua sponte duty to instruct the jury regarding simple mayhem as a lesser necessarily included offense of aggravated mayhem.

As noted, the jury convicted Titus of violating section 205, which states: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." Simple mayhem is defined in section 203, which states: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." Section 203 is a necessarily included offense of aggravated mayhem as defined in section 205. (*People v. Robinson* (2014) 232 Cal.App.4th 69, 79.)

But the trial court's sua sponte instructional duty does not extend automatically to all necessarily included offenses. " 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. "The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the

charge and supported by the evidence." [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense only "[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of" the lesser offense.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96, italics omitted.)

Thus, to prevail on his claim of error, Titus must show there is substantial evidence from which a reasonable jury could conclude he committed simple mayhem, but not aggravated mayhem. A substantive distinction between these offenses pertains to the element of intent. (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1226; see also *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347–1348.) Simple mayhem in violation of section 203 " 'is a general intent crime. [Citations.] The necessary intent for mayhem is inferable from the types of injuries resulting from intentional acts.' " (*Villegas*, at p. 1226.) Aggravated mayhem, by contrast, "requires the specific intent to cause the maiming injury." (*People v. Assad* (2010) 189 Cal.App.4th 187, 195; see also *People v. Ferrell* (1990) 218 Cal.App.3d 828, 833 (*Ferrell*).) " 'Furthermore, specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately.' " (*People v. Park* (2003) 112 Cal.App.4th 61, 64.)

In this case, the prosecution presented evidence that Titus specifically intended to inflict a disfiguring injury on Joshua; Titus accosted Joshua with a shotgun in the early morning hours while Joshua was in bed, and after Carmelita pushed him out the door, he tracked Joshua's movements through a window and shot him in the face. There was no evidence of an unplanned or indiscriminate attack. The defense disputed that Titus was the shooter

but elicited no evidence from him or any other witness to support a finding that Joshua's maiming was unintended or that shooting him in the face was an indiscriminate act.

At trial, the defense argued to the jury that the two specific intents required to commit attempted murder and aggravated mayhem "are incompatible with each other," which is simply not true. (See e.g., *Ferrell*, *supra*, 218 Cal.App.3d at pp. 833–834.) Titus does not repeat the argument on appeal, but contends instead that it is permissible for a jury to find that a defendant intended to kill without being convinced that he also intended to maim. We need not test the logic of this argument as it misses the mark. The sua sponte duty to instruct arises only when there is *evidence* to support a finding that the defendant intended to kill but not to maim, and we find none here.

Titus also expresses the view that evidence of his specific intent to maim was "not overwhelming," positing that because he fired only a single shot rather than "a concentrated barrage of controlled firepower" the jury could rationally have concluded that he intended to kill Joshua but not maim him. We are not persuaded by this reasoning, which ignores undisputed evidence that the person who shot Joshua tracked his movements through a window before firing a single shot that hit Joshua in the face. This was a controlled action, and the fact that injury was inflicted with one bullet rather than a barrage reinforces the finding that the shooter specifically intended to maim. (See *Ferrell*, *supra*, 218 Cal.App.3d at pp. 835–836 [single gunshot to the victim's neck supported inference of intent to kill, and if the victim did not die, to disable her permanently]; compare *People v. Lee* (1990) 220 Cal.App.3d 320, 326 [evidence showed "no more than a sudden, indiscriminate, and unfocused battering of [victim's] body"].)

10

Finally, Titus contends he was prejudiced by the failure to instruct the jury regarding simple mayhem. Since Titus fails to prove the instruction was required, his prejudice argument necessarily fails. Moreover, Titus invokes the wrong standard of prejudice to the extent he contends the erroneous failure to sua sponte instruct on a lesser included offense violates federal due process. "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818]." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) Here, Titus fails to carry his burden of proving prejudice for the same reason he fails to prove the underlying error. He does not identify evidence to support a finding that Joshua's disfiguring injury was anything other than intentionally inflicted. Thus, it is not reasonably probable that Titus would have obtained a more favorable outcome if the jury had been given the option to convict him of simple mayhem.

## II. Sentencing Errors Warranting Remand

### A. Section 654

Titus contends the trial court violated section 654 by imposing consecutive sentences for attempted murder (count 1), mayhem (count 2), and shooting at an inhabited dwelling (count 5). The People agree that consecutive sentences should not have been imposed for attempted murder and aggravated mayhem, but disagree that the consecutive sentence for shooting at an inhabited dwelling violates section 654. Although these issues were not raised in the trial court, errors in the applicability of section 654 may be raised for the first time on appeal. (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

11

Section 654 precludes punishing a defendant twice for "[a]n act or omission that is punishable in different ways by different provisions of law." (§ 654, subd. (a).) "The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense—the one carrying the highest punishment." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135, questioned on another ground *People v. Kopp* (2019) 38 Cal.App.5th 47, 85.)

Section 654 also precludes multiple punishments for two offenses that arise from an indivisible course of conduct; if two crimes arose from the same act or series of acts constituting an indivisible course of conduct, multiple punishment is prohibited. (*People v. Sok* (2010) 181 Cal.App.4th 88, 99 (*Sok*).) The pertinent inquiry is not whether two crimes were part of the same course of conduct but whether that course of conduct is indivisible, because the defendant had only one criminal objective, or divisible because the defendant had more than one criminal objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19–20, disapproved on other ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

In this case, we agree with and accept the parties' stipulation that section 654 precludes imposing multiple punishment for attempted murder and aggravated mayhem. Both crimes were accomplished by the same act of shooting Joshua in the face. (*People v. Corpening* (2016) 2 Cal.5th 307, 309 [when same action completes the actus rea for two offenses, section 654 precludes double punishment].) And although there is evidence that Titus harbored different intents in committing these two crimes, the intent to

12

disfigure Joshua was incidental to the intent to kill him. (See e.g. *People v. Mitchell* (2016) 4 Cal.App.5th 349, 353 [armed assault with scissors was incidental to and facilitated armed robbery with scissors].) Thus, the trial court erred by imposing consecutive sentences for attempted murder and aggravated mayhem.

Titus argues that the same analysis applies to his conviction for shooting at an inhabited dwelling. The People do not dispute that the same criminal act that constituted mayhem and attempted murder also constituted shooting at an inhabited dwelling. But they argue separate punishment for shooting at a dwelling is authorized pursuant to the multiple victim exception to section 654's prohibition against dual punishment because Carmelita and Joshua were both victims of this offense. Under the multiple victim exception, " 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' " (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.) "An assailant's greater culpability for intending or risking harm to more than one person precludes application of section 654." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1631 (*Felix*).)

Titus contends the record does not support applying the multiple victim exception to his offense of shooting at an inhabited dwelling, offering two erroneous reasons. First, he argues that Joshua was alone in the RV when he was shot. Titus's citations to the record do not support this contention. He also overlooks that Carmelita testified that she was on the steps inside the RV when Titus fired the gun through her kitchen window. (See *Felix*, *supra*, 172 Cal.App.4th at p. 1631 [defendant need not be aware of number of people in the dwelling to be punished separately for each victim].) Second,

13

Titus argues that the charges in the information pertaining to attempted murder, aggravated mayhem, and shooting at a dwelling all "name but one victim, Joshua." In fact, while Joshua is identified as the victim of the attempted murder and mayhem counts, the count 5 charge for shooting at an inhabited dwelling does not identify a specific victim.

In his reply brief, Titus argues this case is analogous to *People v. Cardenas* (2015) 239 Cal.App.4th 220. The *Cardenas* defendant was convicted of robbery and burglary based on evidence he broke into a residence, physically attacked Ms. Senger, an elderly woman who had been asleep in her bed, took her property, and escaped out a bedroom window just as Senger's son-in-law was unlocking the front door of the home. (*Id.* at pp. 224–225.) Because both offenses involved a single criminal objective and indivisible conduct, section 654 required the trial court to stay the defendant's sentence for burglary, the appellate court found. (*Id.* at pp. 229–233.) In reaching this conclusion, the court found the multiple victim exception did not apply because that exception is limited to cases in which the defendant's otherwise indivisible course of conduct "results in crimes of violence against multiple victims." (*Id.* at p. 230.) Burglary does not necessarily involve an act of violence, the court found, and the record showed that Senger was the only victim of violent offenses committed by the defendant in that case. Specifically, the trial evidence showed that Senger's son-in-law was not actually in the house during the burglary, but even if he had been, the great bodily injury sentence enhancements pertained exclusively to Senger. Absent authority establishing that burglary is "a crime of violence for purposes of the multiple victim exception," and "without an allegation or finding by the trier of fact to support that characterization,"

the *Cardenas* court concluded that the burglary charge had to be stayed under section 654. (*Id*. at p. 232.)

In contrast to *Cardenas*, the issue in this case is not whether the multiple victim exception applies to Titus's burglary conviction, but whether it applies to the crime of shooting at an inhabited dwelling. Pertinent authority establishes that this offense necessarily involves an act of violence. (*Felix*, *supra*, 172 Cal.App.4th at pp. 1630–1631; *People v. Anderson* (1990) 221 Cal.App.3d 331, 338–339.) Moreover, while there was only one victim of the violent offenses committed by the *Cardenas* defendant, there is evidence in this record that a second victim was inside the RV when Titus committed this offense. " 'As long as each violent crime involves at least one different victim, section 654's prohibition against multiple punishment is not applicable.' " (*Anderson*, at p. 338.) In this case, Joshua was the only victim of the attempted murder and aggravated mayhem offenses, but there is substantial evidence that Carmelita was an additional victim of the violent offense of shooting into an inhabited dwelling. Thus, the consecutive sentence for this later offense does not violate section 654.

By separate argument, Titus contends that even section 654 does not apply to shooting into an inhabited dwelling, it does apply to the enhancement attached to this offense for "personally inflict[ing] great bodily injury on any person other than an accomplice in the commission of a felony" in violation of section 12022.7, subdivision (a) (section 12022.7(a)). Titus reasons that the additional term for this enhancement constitutes impermissible double punishment because the court imposed an additional term for the section 12022.7(a) enhancement attached the aggravated mayhem conviction, which is based on the same exact injury. However, section 654 does not apply to sentence enhancements based on a single injury

15

when those enhancements are attached to substantive offenses that are covered by the multiple victim exception to section 654. (*People v. Oates* (2004) 32 Cal.4th 1048, 1066; see also *People v. Reyes-Tornero* (2016) 4 Cal.App.5th 368, 378–379 [following *Oates*].) In this situation, the enhancements " 'simply follow from' " the defendant's substantive convictions and " 'do not constitute separate crimes or offenses, but simply are the basis for the imposition of additional punishment for the underlying substantive offense.' " (*Oates*, at p. 1066; see *Reyes-Tornero*, at pp. 379 & 380.) Thus, because section 654 does not apply to the Titus's conviction for shooting at an inhabited dwelling, it does not apply to the related section 12022.7(a) enhancement.

The fact remains that Titus's sentence must be modified because the consecutive sentences for aggravated mayhem and attempted murder violate section 654. Although a section 654 error does not always warrant a remand, the People concede that this case should be remanded, perhaps because multiple other errors resulted in a miscalculation of Titus's sentence. We note also that when Titus was sentenced, section 654 required the trial court to impose punishment for the crime providing for the longest term of potential punishment, but that requirement has since been eliminated by amendment. Titus is entitled to the ameliorative benefit of this amendment, as the judgment is not yet final. (See *In re Estrada* (1965) 63 Cal.2d 740.)

## B. Other Sentencing Issues

The People concede the following additional errors with respect to Titus's sentence: The consecutive term for the section 12022.7(a) enhancement attached to the shooting at an inhabited dwelling offense should be one year, not three years. (§ 1170.1, subd. (a).) The base term sentence for aggravated mayhem (as distinguished from the enhancement for

16

that crime) should be 14 years to life, rather than 25 years to life. (§§ 3046, subd. (a)(1), 667, subd. (e)(1), 1170.12, subd. (c)(1).) And the section 12022.5 enhancement for burglary should be 1 year, 4 months, rather than 2 years, 8 months. (*Sok, supra,* 181 Cal.App.4th at p. 93 [enhancements are not doubled when defendant suffered one prior strike].) The trial court is directed to address these, and any other matters raised by the parties, at resentencing. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

The judgment is reversed, and the matter remanded for resentencing. Following resentencing, the trial court is directed to prepare an amended abstract of judgment, which shall be forwarded to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.


TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
PETROU, J.


*People v. Titus* (A164999)

17