Filed 3/19/25  P. v. Henriquez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN CARLOS MARTINEZ HENRIQUEZ,<br><br>    Defendant and Appellant. | A163261<br><br>(Marin County<br>Super. Ct. No. SC197429A) |

A jury found defendant Juan Carlos Martinez Henriquez guilty of first degree murder with the special circumstance of lying in wait, attempted premeditated murder, and two counts of aggravated mayhem.  The jury also found defendant committed the crimes in association with a criminal street gang under Penal Code section 186.22, subdivision (b).[1]

On appeal, defendant does not challenge the sufficiency of the evidence that he committed first degree murder of one victim and attempted murder of a second victim, he killed by means of lying in wait, and his attempt to murder was willful, deliberate and premediated.  But he contends the prosecution presented insufficient evidence of his intent to support the two convictions of aggravated mayhem as to each of the same two victims.  We

---

[1] Further statutory references are to the Penal Code.

reject this contention. In addition, the parties agree the gang enhancements must be set aside because of intervening changes to section 186.22 that apply to defendant's case, and we agree with the parties on this point.

Accordingly, we reverse the gang-related enhancement findings and remand, but otherwise affirm the judgment. On remand, the prosecution may retry the gang enhancement allegations if it so chooses.

## FACTUAL AND PROCEDURAL BACKGROUND

The Marin County District Attorney charged defendant with first degree murder of Edwin Josué Ramirez Guerra (Josué) with the special circumstance of lying in wait (§§ 187, subd. (a), 190.2, subd. (a)(15); count 1), attempted premeditated murder of Llefferson Diaz Morales (Llefferson) (§§ 664, subd. (a), 187, subd. (a); count 2), aggravated mayhem of Josué (§ 205; count 3), and aggravated mayhem of Llefferson (*id.*; count 4).[2] For all counts, it was alleged that defendant committed the crimes in association with a criminal street gang (§ 186.22, subd. (b)) and he personally discharged a firearm and caused great bodily injury (§ 12022.53, subd. (d)).

*Trial Evidence*

Llefferson Diaz Morales

Llefferson testified he was born in Guatemala and moved to Novato with his family in 2016 when he was 16 years old. In April 2016, he started attending Novato High School and became friends with Josué, a classmate who was also from Guatemala. At school, Llefferson also met defendant and Edwin Guevara (Edwin), who were from El Salvador. Defendant asked

---

[2] In their appellate briefing, the parties refer to many individuals in this case by their first or middle names or monikers. For consistency's sake, we follow suit.

2

Llefferson about gangs in Guatemala, and Llefferson told him the gang where he was from was "the 18th."

On May 25, 2016, Edwin invited Llefferson and Josué to smoke marijuana with him and defendant. After school, Llefferson, Josué, and Edwin went to defendant's house, and defendant said they would go to a waterfall to smoke. Llefferson did not know the way, and he and Josué followed defendant and Edwin until Edwin received a call and left the group. Llefferson and Josué continued following defendant, who appeared to be on his phone texting. The three boys took a trail to the top of a waterfall.

As Llefferson reached a big tree, defendant said, " 'They're here,' " and "[t]wo guys came out from behind the tree." A "thin guy" had a "big" machete (Llefferson indicated the blade was 20 to 24 inches long), and a "fat one" had a knife about eight to 10 inches long. Defendant moved closer to the two attackers and looked at Llefferson and Josué. Defendant had a gun that looked like a revolver. Llefferson started running, but defendant and the "fat one" caught him. Llefferson was on the ground, and the "fat one" stabbed him in the neck and arms. From about two feet away, defendant shot Llefferson twice, first in the head and then in the chest. Llefferson "asked [defendant] why he was doing that," and defendant "just laughed." Llefferson pretended to be dead, and "[defendant] and the fat one went after [Josué]." Llefferson could hear Josué crying and "asking why they were doing that." Afterward, defendant came back and looked at Llefferson and then left.

About 10 minutes after defendant left him the second time, Llefferson got up and called 911. Llefferson walked down the trail as he talked to a 911 operator. He saw Josué on the ground; he appeared to be dead. The police met Llefferson, and he was taken to the hospital by ambulance.

Llefferson had a bullet in his neck that was removed about a year later. At the time of trial in 2021, he still had scars on his neck, arms, and back.

Elmer Machado-Rivera

Elmer Machado-Rivera (Elmer) testified he was born in El Salvador, and he moved to San Rafael in 2013 when he was 18 years old. Where Elmer grew up in El Salvador, Mara Salvatrucha (MS-13) and 18th were rival gangs. In the United States, Elmer joined MS-13 as a "paro," the lowest rank in the gang.[3] To become a paro, Elmer met Edenilson Alfaro, known as "Lil Sicario," who was the leader of the Park Vista Locos Salvatrucha (PVLS) clique of MS-13. As a paro, Elmer would sell marijuana and give gang members rides.

Elmer's cousins Edwin and Javier Guevara (Javier) introduced him to defendant. Defendant said he had been a paro for MS-13 in El Salvador. Elmer took defendant to meet Lil Sicario, and defendant talked about his gang experience in El Salvador and the possibility of joining PVLS. Defendant told Lil Sicario about two people he suspected were from a rival gang (referring to Josué and Llefferson) and said "he could investigate." Later, defendant told Elmer he got the green light from Lil Sicario to kill Josué and Llefferson. Defendant said the plan was to invite the two boys to a party where they might be killed. On May 13, 2016, Lil Sicario told Elmer to give defendant a ride. Elmer picked up defendant and Josué to take them to a party, but during the drive, defendant said the party was canceled. After they dropped off Josué, defendant told Elmer the plan "was canceled because

---

[3] Elmer testified that the next rank higher than "paro" is "observacion," above that is "chequeo," and above that is "pase para homeboy."

4

Llefferson wasn't going, and Llefferson could rat on [defendant] if anything happened to Josué."[4]

Around 5:20 p.m. on May 25, 2016 (the day of the attack), defendant called Elmer for a ride. Elmer picked up defendant and drove him to Santa Cruz where they met other gang members to "hide some weapons"; Elmer saw a machete. Elmer then drove defendant, Javier, and another gang member to Mendota. On the drive, they "talked about the attack that they had carried out." Defendant said he attacked Josué and Llefferson. Defendant said Javier had a machete and Josué had a rock; defendant "told Josué to put the rock down and Josué thought [defendant] was helping him, and then they started cutting him with a machete." Defendant told Elmer he stabbed Josué and shot Llefferson. Defendant talked about being promoted in the gang; Elmer testified that defendant said "probably he would get pase para homeboy" "[b]ecause the crime was committed against two people," but defendant did not know "if Javier would be able to get pase para homeboy because he was only with Josué." When they arrived in Mendota, there was a gang meeting with Lil Sicario and other gang members. Defendant told the group what he had done, and "[t]hey were laughing, but like in a way to congratulate him."

The Victims' Injuries

Sheriff's deputies found Josué's body face down in a creek area. A ball cap, a clump of hair, and two severed fingers were found about 48 feet from his body; another severed finger was found about 15 feet from his body.

---

[4] Elmer's testimony was corroborated by Llefferson, who testified that defendant asked him and Josué to smoke marijuana with defendant and some of his cousins that day. After Llefferson texted that he could not make it, defendant responded, " 'Hey, then we're not going to go.' "

Rocks in the creek bed next to the body were found with blood and hair fibers attached to them. The pathologist who performed the autopsy on Josué's body testified that his head showed severe injuries, some consistent with being struck by a bladed weapon and others more consistent with being struck by a blunt object such as the bloody rocks found near his body. It was "very plausible" that one of the "chop" wounds "on the back of the head may be related to the amputation of the fingers and by one of the chop impacts," suggesting Josué was trying to protect his head with his hands.

The trauma surgeon who treated Llefferson testified he suffered a through-and-through gunshot wound to the chest and right hand, a gunshot wound on the left side of his forehead,[5] and lacerations on his neck and arm consistent with being stabbed with a knife.

*Verdict and Sentence*

The jury found defendant guilty as charged and found all enhancement allegations true. The trial court sentenced defendant to life without the possibility of parole for count 1 (first degree murder) and a consecutive 40 years to life for count 2 (attempted premeditated murder) consisting of 15 years to life for the offense, plus consecutive 25 years to life for discharging a firearm and causing great bodily injury. The court also imposed and stayed pursuant to section 654 terms of 40 years to life for each of counts 3 and 4 (aggravated mayhem).

---

[5] The doctor explained that a gunshot to the head is "usually a non-survivable injury" "because a bullet to the forehead would usually penetrate the skull." But it appeared the bullet in this case "ricocheted, went through his nose, and then ended up in the right side of his neck," "a pretty unusual trajectory."

## DISCUSSION

A. *Sufficiency of the Evidence of Aggravated Mayhem*

Defendant contends the evidence was insufficient to sustain the counts of aggravated mayhem. We disagree.

### 1. Applicable Law and Standard of Review

"A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." (Pen. Code, § 205.) Aggravated mayhem is a specific intent crime requiring "proof beyond a reasonable doubt 'that the defendant acted with the specific intent to cause a maiming injury.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 86 (*Manibusan*).)

"[E]vidence which shows no more than an ' "indiscriminate attack" ' on the body of the victim is insufficient to prove the specific intent to commit mayhem under section 203," and "specific intent cannot be inferred solely from evidence that the injury inflicted constitutes mayhem; instead, there must be other facts and circumstances which give rise to an inference of intent to maim rather than attack indiscriminately." (*People v. Lee* (1990) 220 Cal.App.3d 320, 325 (*Lee*).)

" '[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful,' and evidence that is sufficient to establish a defendant's intent to kill the victim can also be 'sufficient to establish the intent to permanently disable or disfigure that victim.' " (*Manibusan, supra,* 58 Cal.4th at p. 89.)

7

In assessing a claim of insufficiency of the evidence, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]"  [Citation.]  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*Manibusan*, *supra*, 58 Cal.4th at p. 87.)

When a crime requires proof of specific intent, " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'  [Citation.]  Moreover, the standard of review that applies to insufficient evidence claims involving circumstantial evidence is the same as the standard of review that applies to claims involving direct evidence.  'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]"  [Citation.]  "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible

of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*Manibusan, supra*, 58 Cal.4th at p. 87.)

2.      Analysis

Defendant argues that no rational juror could have found beyond a reasonable doubt that he acted with the specific intent to maim as required for aggravated mayhem.

Cases addressing claims of insufficient evidence of specific intent for aggravated mayhem are instructive. In *People v. Ferrell* (1990) 218 Cal.App.3d 828, 831 (*Ferrell*), for example, defendant Ferrell's conviction of aggravated mayhem was affirmed where the trial evidence showed the following. Ferrell asked where the victim's apartment was, stating, " 'A friend from jail sent us,' " then entered the victim's apartment, pointed a gun at the victim's mother, told the victim's father not to move (and when he moved, shot him in the knee), and then shot the victim in the neck from about two feet away, causing "severe partial paralysis"; the entire incident lasted only a few seconds. (*Id.* at pp. 831–832.)

Rejecting Ferrell's claim that the evidence was insufficient to "establish the specific intent to cause permanent disability or disfigurement," the Court of Appeal reasoned, "Viewed in the light most favorable to the judgment, that evidence established that this bizarre shooting was a cold and deliberate attack. . . . It takes no special expertise to know that a shot in the neck from close range, if not fatal, is highly likely to disable permanently. [Ferrell]'s

9

shooting of [the victim] was not an indiscriminate, random attack on her body; instead, the shooting was directed and controlled. From all this evidence, the jury could reasonably have inferred that [Ferrell] intended both to kill [the victim], and, if she did not die, to disable her permanently. Substantial evidence supports the jury's verdict." (*Ferrell*, *supra*, 218 Cal.App.3d at pp. 833, 835–836.)

In contrast, in *Lee*, *supra*, 220 Cal.App.3d 320, the same court that decided *Ferrell* concluded there was insufficient evidence to show specific intent for aggravated mayhem where the defendant went to his neighbor's room, hit the neighbor with his fist—striking his nose, eye, and mouth—and kicked the victim at least twice. (*Id*. at pp. 323, 326.) The court explained, "Defendant here did not shoot or stab his victim; instead, he used his fists and his feet. Defendant punched his victim in the face three times. Defendant also kicked his victim at least twice somewhere on his body, but there was no evidence that the kicks were to his head. The evidence shows no more than a sudden, indiscriminate, and unfocused battering of [the victim]'s body. While this evidence undoubtedly shows extreme indifference to [the victim]'s physical well-being, it does not show a controlled, directed, limited attack similar to that in . . . *Ferrell*, from which a jury could reasonably have inferred that defendant specifically intended to disable [the victim] permanently." (*Id*. at p. 326.)

More recently, in *Manibusan*, *supra*, 58 Cal.4th at page 47, defendant Manibusan was convicted of aggravated mayhem (as well as two counts of first degree murder and one count of attempted murder) where the evidence showed the following. After taking methamphetamine and staying up all night and the next day, Manibusan and codefendant Willover drove around the towns of Seaside and Monterey with two associates and discussed robbing

people; Willover had a gun. (*Ibid*.) When they spotted victims Priya Mathews and Jennifer Aninger, Manibusan made a U-turn to observe the women and then "made another U-turn, putting the women on the passenger side of the car, where Willover, wearing a leather glove on one hand and a bandana over his face, was sitting." (*Id*. at p. 48.) Willover told the women to give him their money, and when they did not respond, Willover turned to his companions "and said 'something like, these bitches are being assholes. They didn't hear me.' He then turned back toward the women, pointed his gun at them, and started firing. He fired numerous times, hitting Mathews in the back, the arm, and twice in the left thigh, and hitting Aninger once in the head and once in the upper arm. Mathews died from her wounds. Aninger survived, but sustained brain damage that resulted in an impaired ability to concentrate, memory loss, a lost sense of smell, and lost motor function in her left hand." (*Ibid*.) After the shooting, "Willover said, 'we couldn't leave witnesses,' and [Manibusan] 'just kind of laughed' in response. . . . '[Willover] said . . . [Manibusan] needs to try it.' . . . [Manibusan] seemed 'happy,' 'like he was proud of' Willover. They congratulated each other on the shooting, giving each other 'props.' [Manibusan] said 'he wanted to have his turn.' " (*Ibid*.) The same night, Manibusan discussed finding another victim and personally shot and killed another woman. (*Id*. at pp. 48–49.)

On appeal, Manibusan argued the evidence did "not show 'that any of the participants intended to inflict [on Aninger] a permanent or disfiguring injury,' but show[ed] only 'a sudden and indiscriminate attack following closely upon the heels of an ineffectual attempt at robbery.' " (*Manibusan, supra*, 58 Cal.4th at p. 86.) Rejecting this claim, the California Supreme Court explained that, while "a juror perhaps could have" agreed with Manibusan's suggestion that the "shooting was only 'a sudden and

11

indiscriminate attack,' " "a juror also could have reasonably concluded otherwise." (*Id*. at pp. 87–88.)  Specifically, "a juror reasonably could have concluded that the Aninger shooting . . . was the result of a desire [Manibusan] and Willover shared to kill or to cause permanent disability, either to silence potential witnesses or simply for sadistic pleasure." (*Id*. at pp. 90–91.)

Considering the principles stated in, and the facts and circumstances of, *Manbusan*, *Ferrell*, and *Lee*, we find sufficient evidence to sustain the aggravated mayhem convictions in this case.  Here, the evidence shows defendant planned a violent attack and coordinated with many others; he attacked Llefferson and Josué in concert with two other armed gang members; he used a gun and machete and his confederates used a machete, a knife, and rocks; he laughed at Josué as he killed him and bragged and laughed about the crimes later with his confederates; and his motivation for the crimes was to gain status in his gang.  From these circumstances, a juror reasonably could conclude that defendant intended to kill Llefferson and Josué, and if they did not die, to disable or disfigure them permanently.

Defendant claims the facts that he shot Llefferson twice (not once as in *Ferrell*) and he apparently went back to check whether Llefferson was dead, "negate a finding of aggravated mayhem," and he asserts the record lacks substantial evidence that he intended to maim "*rather* than kill." (Italics added.)  He relies on Justice Werdegar's dissent in *Manibusan*, in which she urged that the specific intent for aggravated mayhem "is the intent to inflict a grievous injury *but allow the victim to live*." (*Manibusan, supra*, 58 Cal.4th 40 at p. 104 (conc. and dis. opn. of Werdegar, J.).)  But as we have seen, a finding of intent to kill does not negate a finding of intent to maim.  To the contrary, the majority in *Manibusan* recognized, " '[A] defendant may intend

12

*both* to kill his or her victim *and* to disable or disfigure that individual if the attempt to kill is unsuccessful.' " (*Manibusan, supra,* 58 Cal.4th at p. 89, italics added.)[6]

Defendant argues *Manibusan* is distinguishable because in that case there was evidence the victim was shot in a "calculated effort to silence her as a witness, either by killing her or by inflicting some other 'permanent disability'—such as brain damage—that would prevent her from identifying her assailants" (*Manibusan, supra,* 58 Cal.4th at p. 89), but there was no similar evidence here. This argument is unpersuasive. First, a reasonable juror could infer that defendant's intent was to kill Josué and Llefferson and, if either survived, to render the survivor disabled such that he would be unable to identify the attackers. Second, in *Manibusan,* our high court also found the evidence reasonably supported a finding that the "shooting was the result . . . of a desire shared by defendant and Willover to shoot someone simply for sadistic pleasure," citing the circumstances that "Willover acted '[h]appy,' '[l]ike he was proud of what he' had done. . . . Defendant also seemed 'happy,' 'looked like he was proud of' Willover, and congratulated Willover." (*Id.* at pp. 89–90.) In the current case, the evidence similarly supports a finding that defendant used a machete and gun to attack Josué and Llefferson for sadistic pleasure, as well as for higher status in his gang. The evidence shows defendant thought the victims were from a rival gang, he laughed during the attack, and when he told his fellow gang members about it, they "laugh[ed], but like in a way to congratulate him." A reasonable juror

---

[6] Further, in *Manibusan,* the victims were shot "numerous times" and the victim who survived was shot in the head and the upper arm. (*Manibusan, supra,* 58 Cal.4th at p. 48.) The fact the defendant's confederate in that case did not stop after one shot did not negate the finding of aggravated mayhem.

could "infer[] from the circumstances attending [the] act, the manner in which it is done, and the means used" (*Lee*, *supra*, 220 Cal.App.3d at p. 325) that defendant intended to permanently disfigure or disable the victims if he failed to kill them. In short, substantial evidence supports the jury's verdict.

B.     *Gang-Related Sentencing Enhancements*

After defendant's trial in this case, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), effective January 1, 2022, "made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

Assembly Bill 333, which " 'essentially adds new elements to the . . . enhancements in section 186.22,' " applies to defendant because his case was " 'not yet final' " when the law went into effect. (*People v. Tran*, *supra*, 13 Cal.5th at p. 1207.)

Defendant argues the jury's gang enhancement findings under section 186.22, subdivision (b), must be reversed because Assembly Bill 333's changes to the law render them invalid.[7] The Attorney General concedes the gang enhancement findings must be vacated in light of changes to the law and adds that the matter should be remanded to allow the prosecution the opportunity to prove the gang enhancement allegations under current law. In his reply, defendant does not dispute that the appropriate disposition on this issue is remand for possible retrial on the gang enhancement allegations.

We agree with the parties and will reverse the gang enhancement findings under section 186.22 and remand for retrial of the gang allegations at the option of the prosecution. (See *People v. Campbell* (2023) 98 Cal.App.5th 350, 381 ["the proper remedy for the instructional error regarding the elements of the gang-related gun enhancement and the gang special circumstance . . . is a reversal and remand of the enhancement and special circumstance, for retrial at the option of the People"]; *People v. Sek* (2022) 74 Cal.App.5th 657, 669, 674 [reversing gang enhancement finding because of Assembly Bill 333's changes to the law and specifying "[o]n

---

[7] Defendant points out that the jury was instructed it could consider his current offenses as predicate crimes to show a pattern of gang activity, which is not allowed under the law as amended by Assembly Bill 333, and he argues the prosecution failed to prove the predicate offenses benefitted the gang as is now required under the current law. In addition, the Attorney General acknowledges that the jury instructions in this case "were prejudicially erroneous under the current law in other respects as well."

remand, the prosecution shall have the option to retry the defendant on the gang allegations"].)

## DISPOSITION

The gang enhancement findings are reversed, and the matter is remanded.  The judgment is otherwise affirmed.  On remand the prosecution shall have the option to retry defendant on the gang allegations.


_____
Miller, J.


WE CONCUR:


_____
Stewart, P. J.


_____
Desautels, J.


A163261, *People v. Henriquez*